Good morning. May it please the Court, I'm Jesse Showalter of Robins and Curtin on behalf of Appellant Shari Ferreira. Zachary Daughtry was assaulted in his segregation cell at the Maricopa County Jail on July 9, 2014. The evidence that we had at trial and the primary theory that we had at trial was two-fold. First, the Maricopa County knew that its customs and practices for dealing with the mentally ill put mentally ill detainees like Zachary Daughtry at risk. And that that risk and those customs and practices are what caused his death. But the District Court excluded that evidence, specifically the Graves litigation that put Maricopa County on notice that its customs and practices were deliberately indifferent to the health of the mentally ill. If you're going to cite the Graves litigation, are you looking at Judge Wake's 2014 order? Is that the principal thing that you would have liked to have done? I mean, I know that you had Dr. Stewart and others that would have testified about the Graves litigation, but the principal evidence of the Graves litigation would have been Judge Wake's 2014 order? Correct, Your Honor. Okay. And which of his findings would most impact this case? His specific findings in that order were that mentally ill was first that Maricopa County had no policy regarding disciplining those who were mentally ill that were within its care, custody, and control. It had no written policy. Okay. Which I have Judge Wake's order. So you can give me an ER site or you can give me a paragraph number or something or a page number in the order. I mean, I have some things that I thought might have been relevant, but I want to know what you think was the most relevant. If you could have cited a particular paragraph. It was ER 1261 through 1262. Okay. So 1261. Okay. That deals with, well, 1262 deals with suicide prevention. 1261 to 1262 is mental health care discipline. And it's paragraphs 196, 197, and 198. Okay. Defendants do not have a written policy regarding the use of discipline for behavior resulting from serious mental illness. They don't have a written policy regarding the use of isolation. And they don't require mental health staff be consulted regarding discipline of pretrial identified as having serious mental illness. How do those help you? Those are very, very general. The reason they help us is because they established that what was actually happening here wasn't some isolated incident. It wasn't what Maricopa County argued in closing, unforeseeable, unpredictable. They had knowledge that these customs and practices existed in their jail. But because this evidence was excluded. See, I thought you were. Explain that to me. Yeah. How does the finding you cited establish the point you're trying to make here? What Judge Wake found was that in August of 2013, because that's the effective date of his rulings, these were problems in Maricopa County jail. And he ordered remedies for these issues. Don't just say these were problems. Point to something more specific. What is it that should have alerted the county? Mentally ill pretrial detainees were being disciplined for acting out on mental illness. And the result of that. Okay, let's just take that one. That's what you identified to us. I don't know how that speaks to your case. Because the issue here isn't how either the decedent or the other person in the cell was being disciplined. And I don't agree with that, Your Honor. And can I tell you why? Okay. That's why I'm asking the question. What happened with Zach Daughtry is he came into the Maricopa County jail in December of 2013 as a minimum security inmate. He was there on a 30-day trespassing charge. But as a result of repeated incidents that were clearly related to his mental health, he went from being minimum security in which he's with nonviolent offenders, first-time offenders, to being in medium security. And he keeps acting out on his mental health. And so. Kept jacking up his degree of security because of his acts. And he spent 200 days in disciplinary segregation locked in a room as a result of acting out on that mental health. And we weren't allowed to show that Maricopa County knew that it had this custom and practice in place. Well, if I look at the paragraphs you cited to me, it says they don't have a written policy. They don't have a written policy. And 198 is defendants do not require the mental health staff be consulted regarding discipline. 198, it seemed to me, was probably the most relevant for what you, for what I thought were the principal issues in your case. That is that there was a lack of communication between those who were classifying and those who were making the jail assignments. Correct. And I want to be very clear because there are two separate approaches that we had. Because we sued Maricopa County, and we sued its director of health services, and we also sued the sheriff. And as to the mental health services, they were in this because of these graves-related issues. The sheriff was also in this because of the graves-related issues. So what did Judge Teelborg deny you from the graves litigation that you would have liked to have gotten and that you think would have made a difference here? He didn't let us use any of it. And if you could have used it, you would have done what? You would have filed Judge Wake's order as an exhibit? We would have filed Judge Wake's order as an exhibit. Could you have read to the jury these provisions? Is that what you would have tried to do? And also the remedial provisions, in other words, that Judge Wake ordered that Maricopa County actually needed to address these issues. So not only would we have done that, but we would have been able to question witnesses from Maricopa County about the fact that they knew that this was a problem. Because what happened at trial was Maricopa County was able to feign ignorance. But the fact that you don't have a written policy regarding the use of discipline, which is 196 and 197, suggests that the problem is you don't have a written policy. That doesn't mean that you don't have a policy. It just means it's not written. Correct. But in our colloquies with Judge Teelborg, he didn't even seem to understand that that was a potential basis for Minnell liability. And so we have these — Counsel, I'm having a hard time seeing the relevance of it. Well, I think it goes — the absence of a policy is a policy itself, a policy of inaction. How does that cause injury? How does the lack of policy in writing cause injury? Because the lack of a policy in writing, when they know they need to have that policy, because the policy — It's not the same as knowing we need to have a written policy. They don't think they do. That's why they don't have one. And even more than that, knowing what the policy is supposed to say. Well, it's not about knowing about the policy. It's about knowing that there is a risk, a substantial risk, of harm to the mentally ill. And the policy and the lack of a policy are evidence of that. Your argument is a very, very high level of generality. That's an extremely high level of generality. Of course, I'm not a doctor. I'm not an expert in mental health. But I know that we ought to have — you know, that we need to have — to do something about prisoners who are mentally ill, and we might need to treat them differently from that. That's just sort of intuitive. I think there's some good common sense there. The details, you know, are beyond me at this point as a layman. So you're dealing with such a — at such a high level of generality, I'm just not sure that I see the relevance of this. And I think the relevance of it comes from Dr. Stewart's testimony. Because if Dr. Stewart was allowed to testify about his engagement in graves, his declarations in graves — Why didn't he simply testify about this case? I think the complication here is that, like Judge Bybee, and I read the dialogue with Judge Teelberg, who said exactly the same thing, that this proposition is simply too general. You can focus on the facts of this case, but I don't see this case over here having enough relevance to try to retry all of that here. I understand why he says that. And nothing that I'm aware of presented Dr. Stewart or any other witness commenting specifically on the facts of this case. Was there a limitation of some kind? Yes, we were precluded from going into it at all, and there was a separate — What do you say, it? Going into graves, I understand. Going into the facts of this case, he wouldn't let you examine — He would not allow us to examine Dr. Stewart about specific findings that he had made in the course of going to Maricopa County during the graves litigation, interviewing inmates at Maricopa County, and providing very detailed and lengthy findings that were provided to the court in graves and that resulted in the graves ruling. My sense of this is that the graves is like an 800-pound gorilla, and your presentation kept looking in that direction, and the court was asking you to look at the facts of this case, and he wasn't interested in going into graves, and I can understand why. Well, and I don't agree, because I think there's two issues that I have, is we told the court outright, and this is in the final pretrial order, our first two issues are the custom and practice set forth in graves and the custom and practice that we can identify based on these three previous killings. One of the arguments that Maricopa County makes on appeal is that these custom and practice arguments were an afterthought, but they're the first two issues we identified, and they're set forth in the joint pretrial order. We're here about graves. We're here about the fact that these same customs and practices identified in graves led to this death, and we're here. See, that's the connection that simply the district court thought was pretty remote, and it's a pretty high level, because the issue here, as I understood it, the principal argument we're making has to do with the information that the person responsible for the cell placement did or did not have, which isn't really what graves is about directly. Correct. That's absolutely correct. And even there, I'm not sure what information it was that the lack of a written policy or the lack of a practice of giving that person information. What's the causal connection here to what happened in this particular incident? There are no other incidents that I saw that are of this nature. The other, I guess, three examples all had to do with not a placement and a half hour later somebody's dead, just very different facts. So how does the lack of information causation follow, and how does that connect to this graves litigation? With respect to graves, the issue is this. Zach Daughtry, everybody in classification knows that Zach Daughtry is acting out on mental health issues. Everybody recognizes that. Everybody in detention who encounters him recognizes that. He gets repeatedly disciplined. Most of the discipline that leaves him in segregated housing for 200 days is because he won't leave segregated housing. Never once during the course of that discipline did somebody call mental health and say, Zach Daughtry is sticking around here, he's getting ramped up, should we be disciplining him? Should we be putting him in ever more dangerous environments? And so that's the graves portion. We consider these three prior deaths and the mechanism with which Maricopa County communicated information to the officers, and I should say the fact that they didn't communicate information to officers doing cell assignments, that's a whole separate basis for liability. We believe we could have brought this case on that alone without the graves thing. Counsel, the level of granularity that you've just offered us about this particular case is far more persuasive to me than the very, very general statements you've tried to draw from graves or from Dr. Stewart's testimony. That's far more persuasive. But this evidence you were able to put before the jury. It was evidence we were able to put before the jury, but we weren't able to make it into a Monell claim because we couldn't show the graves context that Maricopa County knew this was a problem, and that is the key from graves. Maricopa County knew it's in graves, and so there was no way we were going to convince them. Well, again, the graves, the problem that I see it, Counsel, is that the paragraphs you've cited to me from the graves litigation are so general that it's, that yes, Maricopa County is responsible for understanding it needs to have written policies about these things, but it didn't specify what the policies had to contain or how. There's no causal connection between that and this. It's just too high a level of generality. But all we have to show in a Monell claim is notice of the problem. And these requests for granularity from the court with respect to the prior killings that happened, there's no Monell case that says that you need to show these killings that are on all fours with a killing that happens later. They gave notice. Were they similar circumstances to the one that you have here? They're absolutely similar circumstances. Two people in the same cell. They're segregation cells. People locked together in tiny cells for 23 hours a day, and they know three deaths. That's a huge number of deaths. Each one of those deaths put them on notice. On notice of what? On notice that the way they're assigning cells is dangerous. And how many prisoners do they have in the prisons at any given time? These are all pretrial detainees. These are mostly pretrial detainees. And the average daily population in Maricopa County Jail is 9,000. But very few of them are in segregation cells. And segregation cells are this dangerous environment to begin with. You don't lie on the street. Actuarily, our risks, we have heart disease, whatever. But when you lock two people into a 23-hour lockdown together, you are making a decision that the most dangerous, the most likely risk to each of those people is the person they're locked up with. Maricopa County knew it. Maricopa County knew that there was this history of deaths. And it was allowed to feign at trial that it had no knowledge of that, that all of this was unforeseeable. And then in closing, they were allowed by the district court to make it out that we had done something wrong in trying to get this evidence in. And I think that is inexcusable. We tried our best without any order in limine to get in this evidence. We can't get it in over their objections. Then, in closing, their counsel stands up and says, I've never seen anything like this. I've never seen anything like this. You saw all those objections. They train for this in plaintiff seminars. He made that up. He told the jury. It was improper, obviously. And he told the jury. He told the jury that 88 percent of his objections had been sustained. He made that up. What if I had stood up and argued counter to what he said in closing? If I had done that and said, well, actually, we had very significant, what we consider to be very probative evidence about Maricopa County's notice in the form of previous deaths, I would have probably gotten sanctioned. There would have been a mistrial, and I'd be paying Maricopa County's fees. He made an improper argument to which we were not permitted by our own ethical standards and by the Court's orders to even respond. Counsel, I think we understand the argument. You're almost two minutes over your time. I will allow you some time. We've taken quite a bit of your time. So I will allow you some time for rebuttal. Thank you, Your Honor. Mr. Aceto? Good morning. I'm Nick Aceto, and I'm arguing today on behalf of the Appellees. I think all judges on the panel have hit the nail on the head here, that all of the proffered evidence that we're talking about has to be relevant to their theory of the case. And their theory of the case was that Maricopa County allegedly had two practices that exposed Zach Daughtry to a substantial risk of serious harm. And we just talked about those, one being a policy of allegedly punishing mentally ill inmates for behavior resulting from their mental illness. And two, the tower officers, the officers responsible for assigning detainees to their cells, not reviewing all available information. Those are the two policies or the two alleged practices. And when you look at Graves and you look at the Graves order and the Stewart evidence, there's absolutely no connection between those proffered pieces of evidence and these theories of the cases. They failed to make that connection before Judge Teelburg, who belabored this over and over again, spent 35 minutes in argument, spent 15 minutes over lunch break, came back and continued to argue it. He looked at it every which way and gave plaintiff's counsel an opportunity to try to make the connection, and they never did. They stayed at 30,000 feet. They never made the connection. I would like to address a few specific points that I just heard, the first being relating to the Graves order. You're absolutely right. There were no findings of unconstitutionality in that order. It was simply pointing out that Maricopa County did not have these policies, and that was something that was not disputed. In fact, it was in the pretrial order that it wasn't disputed, and we didn't dispute it at trial, the fact that there were not these written policies in place. That could not have put anybody on notice that, one, Maricopa County had these policies, that Maricopa County's policies were unconstitutional. The bigger point, I think, on this issue is that this order was issued in September of 2014, months after Zach Daughtry's death. So how in the world can this alleged judicial finding, which it's not, that was issued after his death, put Maricopa County on pre-death notice? So it had to do with what happened at this time, but it was post the event, right? That's right, Your Honor. Okay. But at its core, if you just look at the order, and we went through the Graves order, it simply makes statements that you should not punish mentally ill inmates without going through mental health first. That's all it says. That's not something that was disputed at trial. And Maricopa County doesn't have written policies, et cetera, et cetera. We didn't dispute that. But there's no finding of unconstitutionality there. Had the decedent or the assailant seen a psychiatrist or psychologist before this event happened? Many times. Many times. Counsel referenced 200 days in disciplinary segregation. He was going back and forth between general population and the mental health unit. He was there so he was seen by mental health so many times that the treating provider testified exhaustively that he believed that he was malingering, that he was just strategically thinking of ways to get out of general population and into the mental health unit. And, in fact, in this incident, on July 3rd, the last time he was placed in disciplinary segregation, this was just a few days before his death, before they put him in SEG, they ran it through mental health, and mental health cleared him. On July, I believe it's 6th or 7th, just a day or two before his death, mental health evaluated him again. So he was seen over and over and over again. And, you know, plaintiffs tried to make their case that he was mentally ill. The jury obviously did not buy that. Did that office warn the guards to tell them not to put him in with some other guy that had some problems, or did they just decide he was a malingerer and don't worry about it? Well, it wasn't don't worry about him. But, I mean, what mental health does is they'll evaluate him, and if he's suffering from symptoms, they'll treat him. But if they feel that he's not suffering from any symptoms, they'll send him back. If they thought that Zach Daughtry had issues, they could have ordered a house loan. So when they sent him back, they could have told the folks on the cell assigning folks that he needs to be kept alone in his cell because he's at risk. They didn't feel the need to even do that. Had they seen the assailant in mental health before this happened? Yes, they did. Actually, they saw him on the day of the death. He was, I believe, in a court appearance, and he was acting strangely. And then he went to mental health. When he came back from court, they looked at him. He was acting bizarrely. They concluded that it wasn't a symptom of a mental illness. Rather, it was as a result of a drug. He was coming down from drugs. He admitted, I believe. My recollection is he admitted that he had gotten a hold of some drugs when he went out to the court appearance, and that's why he was acting bizarrely. So they had just looked at him just hours before this. And what had happened was he was walking around and was talking about, you know, where's Junior? The officers looked at him. The primary officer actually testified that he was calm, he was collect, and he actually thought that he was just trying to get moved, that he was faking it, saying these things just to get moved. And those were officers that saw him within hours of the murder. They had absolutely no reason to know that he was dangerous or that this murder was foreseeable. It was completely unpredictable. And, frankly, we don't know why or what happened in that cell. We don't. Thank you. I want to touch briefly on counsel's argument regarding the Stewart declaration. If you go back and look at Judge Tilburg's order, he did not issue a blanket prohibition on any and all testimony relating to graves. Actually, this is a quote from the transcript. Quote, conclusions about certain conditions in the Maricopa County jail that Dr. Stewart formulated during his work in graves are not out of bounds simply because he came upon them in another matter. So there wasn't a blanket prohibition. He actually said that he would rule on objections on a question-by-question basis. He was very thoughtful about this. The problem was plaintiff's counsel couldn't make the connection and show the relevance right then and there in the midst of trial. And Dr. Stewart actually did testify that he had worked in the Maricopa County jails for years. That evidence did come in. I believe he had worked in the jails for the last 10 years and formulated opinions about the health care. So the jury did know that he had some experience with Maricopa County. But Judge Tilburg's concern was tethering this case to graves and ongoing class-action litigation regarding mental health care on a broad, sweeping level, and the jury seeing that and thinking, well, if they did something wrong then, they must have done something wrong now. And he was right for excluding that evidence. Finally, on the closing argument. It was a cheap shot, counsel. I'm sorry? It was a cheap shot. By? Whoever offered closing argument. Oh. It was a cheap shot. Well, I think what you have to look at is whether or not the statements were so pervasive that they have permeated the entire proceeding and whether you're firmly convinced that. They have no basis in the record. You know, saying this is a trick that lawyers learn in online classes or wherever it might be had no basis in any fact and it was just an ad hominem shot and it was cheap. Well, let's take that as true. And if it crossed a line, the question still is whether it amounts to reversible error. Right. And did those comments, which were only in closing argument, it wasn't throughout the trial, it was an isolated passage, the jury was instructed at the beginning of the case and plaintiff's counsel reiterated the instruction during their argument that what counsel says is not evidence. Plaintiff's counsel in the rebuttal, they also, to your point, said, I don't know what these seminars are. I've never been to a seminar. In fact, Mr. Showalter told the jury that he previously did civil defense work and that he represented police officers. What was the relevance of objections, the percentage of objections sustained? I think the frustration was the number of times that there were questions posed that were clearly objectionable despite the court's orders and they were over and over and over again. And this is not just limited to the case. But the jury saw all that. Correct. The jury saw all that. And they were instructed. Right. That's correct. I mean, I just don't know what the relevance of the percentage is. It just doesn't, it just doesn't, you know, this is going to depend on the percentages might be outweighed by however many times you objected and your objections are, I'm sorry, that Mr. Showalter objected and how many times, you know, his objections were sustained. I just don't see that there's anything in that percentage that's helpful to anybody. Well, be that as it may, helpful or not. I mean, if you look at the arguments of both counsel and you look at what opposing counsel said, there's a lot of stuff that was outside of the record then in what they had said. I mean, they had said that defense counsel was moving the goal posts, that defense counsel tried to distract us with all this garbage about malingering, that defense counsel wants to turn citizen on citizen against citizen. Defense counsel wants to find you to find them to be less than human, detainees. I mean, there was a lot of stuff that was not in the record that were ad hominem attacks. And notably, plaintiff's counsel didn't object to the statements by defense counsel at that time. They waited until after closing, made a motion for mistrial, which is reviewed for an abuse of discretion. And Judge Tilburg, again, he had sat through this 11-day trial. He was aware of the objections and whether the questions were objectionable and the number of times they were sustained. He was keenly aware of how the jury was perceiving everything. And he said, he said, look, counsel, I think that there was some line crossing on both sides. So I'm going to just leave it as is and we'll submit this to the jury. So Judge Tilburg clearly didn't think that there was this, that it was so prejudicial that it permeated the entire proceeding and would have influenced the jury's verdict. And if you look at the way that this trial proceeded and the evidence that was presented, this came down to whether or not the jury believed that Zach Daughtry was a victim and mentally ill and whether Brian Bates was a violent psychopath. And they clearly didn't believe that. They didn't believe that at all. That's what this case was about. And they quickly returned a defense verdict. Unless the Court has any other questions, I have nothing further. Roberts. Thank you, Mr. Arcedo. Arcedo. Thank you. Mr. Showalter, I'll give you a minute for anything that you'd like us to know about. I want to make sure that the Court is aware that Maricopa County had identified and designated Zach Daughtry as being mental health chronic care. And that's in the record at Supplemental Excerpt of Record 1199 where Dr. Jaffe testifies about that. So all these arguments about him not being mentally ill, him being malingering, it's clear that because of that designation, all the customs and practices and policies for mental health people applied to him, and Dr. Jaffe conceded that. The jury heard evidence about that, right? Correct. I just want that known. I want that out there because I think we missed it in the briefings. Whatever Dr. Jaffe said, and Dr. Jaffe testified for a very long time, Maricopa County designated Zach Daughtry as being subject to chronic mental health care, and these customs and practices identified in Graves applied to him. With respect to the closing arguments, it went above and beyond, in our opinion, a cheap shot because it was a shot to which we could not respond without forcing a mistrial and potentially being sanctioned. And the 88% number, we've never seen any support for that. There's no statistics for that. It was made up out of whole cloth. They've never said, oh, here's the percentage of what was and where they happened. They made it up. And then to say that our arguments, which we bring out in rebuttal to these attacks on us, are somehow they had the opportunity to plan for their closing, and they planned that in their closing they would make these cheap shots, they would make these improper arguments, and then in 15 minutes of rebuttal, we had to address them without forcing a mistrial and getting sanctioned ourselves. And that combined with the fact that the district court allowed them to capitalize on what were, in effect, piecemeal rulings on motions in limine. The district court denied every single motion in limine. So when we went into that trial— Counsel, you're well over your time again. Thank you, Your Honor. Thank you. We thank both counsel for the argument. Ferrara v. Penzone is submitted.
judges: Siler, Clifton, Bybee